**Opinion filed February 21, 2025**



## In The

# Eleventh Court of Appeals

_____

## No. 11-23-00034-CR

_____

### D'JAMAN KESHOD WEST, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 12939-D**

## M E M O R A N D U M   O P I N I O N

The jury found Appellant, D'Jaman Keshod West, guilty of the murder of Bronson Alyan Boyles. *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (West Supp. 2024). The jury assessed Appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of twenty years. Appellant challenges his conviction in two issues. In his first issue, Appellant asserts

that the trial court abused its discretion when it denied his requested accomplice witness jury instruction. In his second issue, Appellant challenges the sufficiency of the evidence in reliance upon his contention that the accomplice witness rule is applicable to this case. We affirm.

*Background Facts*

*Jaquay Hight's Testimony*

Jaquay Hight testified that he was playing video games at his mother's house with his friend Jerel Mathis on July 28, 2017. At some point that evening, D'Audre Hight-Ealy, Janie Ortiz, and Appellant arrived. Hight-Ealy was Hight's brother, Ortiz was Hight-Ealy's wife, and Appellant was Hight-Ealy's friend. When Hight-Ealy mentioned that he was leaving, Hight decided to join his brother so that he could get a ride to buy hydrocodone pills. Hight did not know where his brother was planning on going, but he heard Appellant tell Hight-Ealy to "take him to get some free weed." Hight testified that he did not know what Appellant meant by "free weed" at the time, but he knew that both Hight-Ealy and Appellant had counterfeit money in their possession. Hight testified that Mathis was still playing video games and was not a part of the conversation.

Hight-Ealy, Appellant, Hight, and Mathis left the house in Hight-Ealy's white Cadillac.[1] Hight-Ealy was driving. Hight-Ealy first took Hight to purchase hydrocodone pills. After stopping at a gas station, the group proceeded to an apartment complex. Hight testified that he did not know why they were going to the apartment complex and that he was not aware of any "plan."

Hight-Ealy had a friend, Tylik, who lived at the apartment complex. Hight-Ealy and Appellant got out of the car and met Tylik outside. Hight and Mathis remained in the car at first, but followed "a minute or two" later. Hight testified that

---

[1]Hight testified that Ortiz left Hight's mother's home separately.

2

Tylik, Appellant, and Hight-Ealy were walking through the apartment complex, and that he and Mathis were following "10, 15 feet" behind and were "just along for the ride." Hight and Mathis stopped and sat on a "generator"[2] as Hight-Ealy walked up a flight of stairs and went into an apartment. Appellant and Tylik stood on the staircase leading to the apartment. Hight-Ealy remained in the apartment for "a couple minutes."

Hight testified that Hight-Ealy exited the apartment with Boyles and that Hight-Ealy, Boyles, Appellant, and Tylik walked over to where Hight and Mathis were sitting. Hight testified that he believed Boyles had a firearm on his person because he could see the outline of a pistol under Boyles's shirt. Tylik and Hight-Ealy remained close to Hight and Mathis, but Appellant and Boyles began walking. At some point, Appellant pulled money out from his pocket. Hight was "in [his] own zone" and only "half" watching Appellant and Boyles as they walked up the stairs to a third apartment.[3] Hight heard Boyles say, "what" loud enough to prompt Hight to look up at the two men. Boyles and Appellant were "wrestling" on the stairwell. Hight testified that a gunshot went off. Hight "didn't know who shot who" and "took off running." Eventually, Hight-Ealy picked Hight up in the Cadillac. Mathis and Appellant were also in the car. Hight testified that Appellant told the men in the car that he shot Boyles and that he would kill them if they told anyone.

The four men stopped by Hight-Ealy's home for "[m]aybe five" minutes. Only Hight and Hight-Ealy went inside, and Hight could not remember what he did

---

[2]In its brief, the State states that the "generator" referenced in the reporter's record was a transformer box.

[3]Hight admitted that he had already taken the pills that he had purchased by the time the group arrived at the apartment complex.

in the house. The group then went back to Hight's mother's home, where Appellant and Hight-Ealy dropped Hight and Mathis off.

Hight testified that the police searched his mother's home "early on" in the investigation of Boyles's death. A couple days after the initial search, Hight told the police they could find the firearm Boyles was shot with at his mother's home. The police found the firearm in the shed in Hight's mother's backyard. Hight testified that he could not remember who told him the firearm was at his mother's house. Hight said that he wanted the police to find the firearm that was used to shoot Boyles because he thought it might have Appellant's fingerprints on it, which would prove that his brother did not shoot Boyles.

Hight denied being "involved in any kind of sale" of marihuana that night. Hight testified that he knew Appellant had a reputation for fighting and that he did "not really" know Appellant to carry a firearm on his person. Hight acknowledged that he had previously said that Appellant was "ruthless" and known to carry a firearm. Hight testified that he believed Appellant shot Boyles because no one else was on the staircase when the shot was fired.

*Jerel Mathis's Interview*

Mathis testified that he was unable to remember any of the events of July 28, 2017. Both the State and Appellant's trial counsel introduced portions of Mathis's video-recorded police interview. The video clips were admitted and played for the jury by agreement of the parties.

Mathis told the interviewing detectives that Hight-Ealy first told him that they were "going to get some weed" and "never mentioned" that they were going to "hit a lick."[4] Mathis said that it was his understanding that the marihuana was going to

---

[4]Sergeant Paul Martinez testified that, in his experience, the term "hit a lick" meant "[r]ob, steal, theft, stuff like that." "Furthermore, several published cases refer to the term 'lick' as involving robbing or stealing." *Walter v. State*, 581 S.W.3d 957, 974 (Tex. App.—Eastland 2019, pet. ref'd) (collecting cases).

be bought, not stolen. However, Mathis became aware that there was a plan to "hit a lick" while everyone was in the car. Mathis said that "they had it all planned out" about thirty minutes before arriving at the complex, but he and Hight were "just there for the ride, pretty much."

The group arrived at Tylik's apartment first, and Appellant was the only person to immediately leave the car to speak to him. After the other three men got out of the car, the group walked towards Boyles's apartment. Hight-Ealy went into Boyles's apartment, Appellant and Tylik stood by the door, and Hight and Mathis stood further away.

Hight-Ealy exited Boyles's apartment, and Hight-Ealy and Boyles went to go get marihuana. Mathis could see that Boyles had a firearm in the pocket of his sweatpants, and Mathis told Appellant and Hight-Ealy that Boyles had a firearm on him. Boyles asked the group if they were trying to rob him. Appellant pulled a firearm out. Boyles ran up the stairs and Appellant followed. Boyles made it to the top of the stairs and tried knocking on an apartment window. Boyles and Appellant wrestled, and Appellant shot Boyles.

The group left the apartment complex and went to Hight-Ealy's house. Mathis stayed in the car while the others went inside. When the other men returned, Hight-Ealy had a cleaning product with him. Appellant said that he hid the firearm somewhere in Hight-Ealy's shed in the backyard. Hight-Ealy and Appellant dropped Hight and Mathis off at Hight's mother's home and left. Hight-Ealy told everyone in the car to not speak about what happened.

Mathis testified that Hight-Ealy was the "master planner" of the robbery, and Hight-Ealy planned on being the person to talk to Boyles.[5] Mathis said that he had

---

[5]The State introduced a portion of Mathis's testimony from Hight-Ealy's trial, in which Mathis denied saying that the robbery was Hight-Ealy's idea.

never seen Hight-Ealy with a firearm, but had seen Appellant with a firearm. Mathis believed that Appellant shot Boyles because Appellant said that he did, Appellant was the only one with a firearm on his person after the shooting, and Appellant was the only person with Boyles at the top of the staircase when Boyles was shot.

*Janie Ortiz's Testimony*

Janie Ortiz is Hight-Ealy's wife. Ortiz testified that she and Hight-Ealy went to his mother's house and met with Hight, Mathis, and Appellant. Ortiz had gotten a babysitter and was planning on spending time with Hight-Ealy that night. However, Hight-Ealy changed the plans when he offered to give Hight, Mathis, and Appellant a ride. Hight-Ealy told Ortiz to wait for him to get back, but Ortiz was upset and left in her own vehicle.

Ortiz did not see Hight-Ealy again until he returned home "in the middle of the night." Ortiz and her children had fallen asleep in the living room while watching television. Ortiz woke up to the door being unlocked and heard Hight-Ealy go into the kitchen. Ortiz also heard Hight and Appellant in the house. The men were only in the house for "a couple of minutes." On cross-examination, Ortiz acknowledged that she previously told a detective that she only saw Hight-Ealy in the house, but she corrected herself in her testimony and confirmed that she saw Hight and Appellant in the house, as well.

Ortiz did not see Hight-Ealy again until he came back home the next morning. Ortiz testified that Hight-Ealy looked like he had been up all night. Ortiz and Hight-Ealy drove to his mother's house, and Hight-Ealy told Ortiz that Appellant had shot someone. When they arrived at his mother's home, Hight-Ealy was "stressed" and "wouldn't stay still." Appellant told Hight-Ealy to calm down because Hight-Ealy "didn't shoot [Boyles]."

Ortiz testified that she did not allow firearms in her home; she had never seen Hight-Ealy with a firearm. Ortiz had never seen Mathis or Hight with a firearm, either. Ortiz testified that Appellant "always had a gun" "on him."

*Courtney Stanaland's Testimony*

Courtney Stanaland was Boyles's live-in girlfriend at the time of the murder. Stanaland testified that Boyles had recently decided that he no longer wanted to sell marihuana. However, Boyles had about ten grams of marihuana in his possession that day. Boyles told Stanaland that he owed his friend Paul Fisher money and that he was going to sell the marihuana to pay Fisher back and then he would "be done."

Stanaland heard a knock at the door close to midnight. Boyles opened the door to a "random" man that they did not know. The man introduced himself as "Brandon." At trial, Stanaland identified the man as Hight-Ealy, who she described as a "five six, seven maybe" "African-American" man with "[l]ight skin." Hight-Ealy asked Boyles for an ounce of marihuana, and Boyles told him that he did not have that much. Boyles decided to go to Fisher's nearby apartment to get the rest of the marihuana that Hight-Ealy requested so that he could make the sale to Hight-Ealy and pay Fisher back. Boyles told Stanaland to stay in the apartment, lock the door, and wait for him to come back. Stanaland testified that Boyles did not have a firearm on his person and that, to her knowledge, Boyles did not have a firearm in the apartment.

Stanaland locked the door and heard a gunshot "not even a minute later." Stanaland ran to Fisher's apartment and saw that Boyles had been shot. Stanaland said that she was "screaming, who shot my boyfriend, who shot my boyfriend, over and over again" and that people were coming out of their apartments. People that were nearby transported Boyles to the hospital, and Fisher drove Stanaland to the hospital.

Stanaland was able to identify Hight-Ealy in a lineup as the man who knocked on the apartment door. During cross-examination, Stanaland confirmed that she had reported during an interview with police, that Boyles told Hight-Ealy that he was "not afraid to put a [racial slur] down," and that she believed what Boyles "meant by that [was] fighting because he didn't have a gun."

*Paul Fisher's Testimony*

Paul Fisher testified that Boyles was his best friend and that they lived in the same apartment complex. It was a thirty-second walk between Fisher's apartment and Boyles's apartment. Fisher said that he was playing a video game when Boyles was shot and that he did not hear the gunshot because the game he was playing was a "first-person shooter" game. Fisher heard Boyles screaming for help and banging on his door after he was shot. Fisher testified that he helped pick Boyles up and take him to the hospital. Fisher did not see a firearm on Boyles's person that night and did not know of any firearms that Boyles possessed at the time of his death.

*Ashley Day Testimony*

Ashley Day testified that she was walking to her friend's apartment when she saw "three or four guys" talking on a stairwell. Day heard a gunshot, and the men fled. Day did not see the men get into a car, but she saw a "white SUV speed off" and out of the complex. Day called 9-1-1. Day testified that she saw a "light-skinned male with a gun run down the stairs and flee with the rest of the guys." Day said that the man she saw that night was smaller than Appellant and that she would not "mistake [Appellant] for someone who is light-skinned."

*Macaya Edwards's Testimony*

Macaya Edwards testified that Hight and Hight-Ealy are her brothers, and that Appellant is her son's father. Edwards testified that Hight-Ealy was "intoxicated" at some point after Boyles's death and told her that he had killed somebody.

8

Edwards clarified that Hight-Ealy told her that he had "killed" Boyles, not that he had "shot" him. Edwards testified that Hight-Ealy's statement that he killed someone means something "different" than a statement that he shot someone. Edwards could not remember whether Hight-Ealy had ever said that he "shot" Boyles.

*The Investigation*

A spent nine-millimeter shell case and a fragment of a copper jacket from a bullet projectile were recovered from the scene. Boyles's autopsy revealed that there was an imprint of a muzzle on his skin and gunpowder present in the tissue beneath the entrance wound on his body, meaning that the firearm was pressed to him when it was fired.

Sergeant Paul Martinez with the Abilene Police Department testified that he began his investigation at the hospital. Sergeant Martinez spoke with Stanaland twice, first at the hospital and then at the police station. Sergeant Martinez then conducted searches of Boyles's and Fisher's apartments. Officers canvassed the apartment complex to gather information from any witnesses. Sergeant Martinez testified that he spoke with Day, but she "claimed not to hear or see anything."

Sergeant Martinez testified that Stanaland gave him a description of the man who knocked on the apartment door before Boyles was shot. In a lineup, Stanaland positively identified Hight-Ealy as the man she saw that night. After researching Hight-Ealy, Sergeant Martinez drafted a search warrant for Hight-Ealy's home. Hight-Ealy was arrested on outstanding warrants, and he agreed to speak with Sergeant Martinez. A brown leather holster was recovered from a closet in Hight-Ealy's home. Sergeant Martinez also spoke with Hight, Mathis, Tylik, Appellant, Ortiz, and Edwards. Officers then searched Appellant's residence. Detectives

9

recovered a handgun from Appellant's residence, but it was not the handgun used to shoot Boyles.

On August 2, officers received consent to search Hight's mother's home. Officers had been told that the firearm used in the shooting was possibly in the home's backyard, but officers did not find a firearm. The next day, Hight called the police department and said that the firearm was in the storage building behind his mother's home. Hight said that he did not touch the firearm and that it was in a "brown towel and plastic bag." The firearm was found in Hight's mother's shed and was subsequently tested by a ballistics company. Sergeant Martinez testified that the firearm was found to be the weapon used to shoot Boyles. No "usable DNA" was found on the firearm.

Hight-Ealy told Sergeant Martinez that he planned on committing an aggravated robbery and that he knew Appellant had a firearm. Sergeant Martinez asked Hight-Ealy about his alleged statement that he was the person who shot Boyles, and Hight-Ealy told Sergeant Martinez that "he said it, but he was drunk."

Sergeant Martinez testified that he always believed Appellant was the person that shot Boyles, but "there was always that room that [Hight-Ealy] might have just because of some of the things that we were hearing." Sergeant Martinez presented a total of five cases in connection with the murder—one for Appellant, Hight-Ealy, Hight, Mathis, and Tylik—but the District Attorney's Office ultimately chose to prosecute only two of the cases—the ones against Appellant and Hight-Ealy. Sergeant Martinez testified that he sent a case to the District Attorney's Office on Hight-Ealy for the murder of Boyles not because he thought Hight-Ealy shot Boyles, but under the "law of parties." Sergeant Martinez testified that he saw Hight-Ealy testify during his own trial and concluded that Hight-Ealy's testimony left "no

questions" about who the shooter was. Sergeant Martinez testified that he believed Appellant was the person who shot Boyles.

*Requested Accomplice Witness Instruction*

At the charge conference, Appellant's trial counsel requested that "the Court would include the standard jury instruction regarding accomplice testimony and the requisite that there be some independently corroborating evidence of the accomplice's testimony." Appellant's trial counsel argued that Detective Martinez's decision to bring cases for aggravated robbery and murder to the District Attorney's Office against Hight, Hight-Ealy, Mathis, and Tylik in addition to Appellant was "prima facie sufficient" to make them accomplices in fact. The trial court denied the request.

*Analysis*

*Accomplice Witness Instruction*

In his first issue, Appellant asserts that the trial court abused its discretion when it denied his request for an accomplice witness jury instruction because Hight and Mathis were accomplice witnesses.[6] We review an alleged jury-charge error with a two-step process. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). First, we must determine whether error actually exists in the charge, and second, if error does exist, whether sufficient harm resulted from the error to require reversal. *Id.*; *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). If the defendant preserved the error by timely objecting to the charge, an appellate court will reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). We

---

[6]Ordinarily, we would address an issue challenging the sufficiency of the evidence first. But because Appellant's evidentiary challenge in his second issue is based on his assertion that the accomplice witness rule is applicable to this case, we will initially address his first issue.

11

review a trial court's decision not to submit an instruction in the jury charge for an abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 121–22 (Tex. Crim. App. 2000).

Under Article 38.14 of the Code of Criminal Procedure, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2023). "Therefore, if an accomplice to the offense testifies for the State, the accomplice's testimony must be corroborated by non-accomplice evidence that tends to 'connect the accused to the offense.'" *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016) (quoting *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011)). The trial court must include an accomplice witness instruction in its charge if the issue is raised by the evidence because it is the "law applicable to the case." *Id.*

An accomplice is one who participates with a defendant in the commission of a crime and acts with the requisite culpable mental state. *See Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). "The participation must involve an affirmative act that promoted the commission of the offense with which the accused is charged." *Id.*; *Kunkle v. State*, 771 S.W.2d 435, 440 (Tex. Crim. App. 1986).

A witness can be an accomplice either as a matter of law or as a matter of fact. *Ash v. State*, 533 S.W.3d 878, 884 (Tex. Crim. App. 2017); *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013) (citing *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006)). A witness is an accomplice as a matter of law when "the witness has been charged with the same offense as the defendant or a lesser-included offense, or 'when the evidence clearly shows that the witness could have been so charged.'" *Zamora*, 411 S.W.3d at 510 (quoting *Cocke*, 201 S.W.3d at 747–

12

48). If a witness is an accomplice as a matter of law, the trial court must affirmatively instruct the jury that the witness is an accomplice whose testimony must be corroborated. *Id.* But where there is conflicting or inconclusive evidence as to whether a witness is an accomplice, the trial court should include an accomplice witness instruction that "asks the jury to (1) decide whether the witness is an accomplice as a matter of fact, and (2) apply the corroboration requirement, but only if it has first determined that the witness is an accomplice." *Id.*

Appellant contends that the evidence presented at trial entitled him to an accomplice witness instruction because it raised, at the very least, a fact issue as to whether Mathis and Hight engaged in an affirmative act promoting the commission of Boyles's murder. Appellant asserts that by virtue of Mathis's testimony, Mathis and Hight made a plan with Hight-Ealy and Appellant to "rob a drug dealer" and "hit a lick" and thereby constituted an affirmative act to assist in the commission of Boyle's murder. As for Hight's testimony, Appellant asserts that, "[i]f the *group* discussed and planned to 'hit a lick' in Hight's presence . . . it strains incredulity to suggest Hight didn't know exactly what was meant by that term and what was expected of him as back-up[.]" We will construe Appellant's argument as a contention that the trial court should have included an accomplice witness instruction that tasked the jury with determining whether (1) Hight and/or Mathis were accomplices as a matter of fact, and (2) there was corroborating evidence supporting Hight's testimony and Mathis's statement. *See Zamora*, 411 S.W.3d at 510.

In response, the State contends that the trial court did not abuse its discretion in denying Appellant's request to include an accomplice witness instruction in its charge because Mathis and Hight were not accomplices and were "merely present" at the crime scene. The State asserts that there was no evidence that Hight knew

13

there was a plan to commit aggravated robbery or that Hight assisted in or promoted the commission of the robbery. The State further asserts that, even assuming Mathis knew that there was a plan to "hit a lick," there is no evidence that Mathis was actually involved in the crime—only that he had knowledge of a plan to commit a crime and that he was present at the time that crime was committed.

Appellant's contention that Hight and Mathis were "involved in the planning of the armed robbery" is not supported by the evidence. Both Hight and Mathis testified that they kept their distance from the others while they were at the apartment complex. Hight testified that he did not know that Hight-Ealy and Appellant were planning to commit a robbery, he was not involved in any purchase of marihuana that night, and he and Mathis were "just along for the ride." Mathis stated that he was unaware of a plan to "hit a lick" until "they" formulated a plan while in the car. While Mathis did not specify who he was referring to when he said, "they had it all planned out," Mathis stated that he and Hight were "just there for the ride" and that Hight-Ealy was the "master planner" behind the robbery.

In summary, the State is correct in its assertion that the evidence showed only that Mathis had knowledge of a plan to commit a crime and that Hight and Mathis were present during the crime's commission. Mere presence at the scene of a crime is not enough to render a witness an accomplice; nor is a witness an accomplice merely because he knew of a crime and failed to disclose it. *See Druery v. State*, 225 S.W.3d 491, 498–500 (Tex. Crim. App. 2007) (holding that two witnesses' knowledge that the appellant was planning on murdering someone and presence at the murder were not affirmative acts entitling the appellant to an accomplice witness instruction); *Kunkle*, 771 S.W.2d at 441 (holding that a witness's knowledge of a group's planned crime, failure to abandon the group, and presence at the crime were not sufficient circumstances to warrant an accomplice witness instruction). Rather,

14

there must be sufficient evidence to connect the witness to the crime as a "blameworthy participant." *Druery*, 225 S.W.3d at 498; *Cocke*, 201 S.W.3d at 748. Accordingly, there was no evidence in the record to support that Mathis or Hight were accomplices in Boyles's murder. Therefore, an accomplice witness instruction was not law applicable to the case, and the trial court did not abuse its discretion in refusing to include an inapplicable instruction in its charge. *See Ambrose*, 487 S.W.3d at 593. We overrule Appellant's first issue.

*Sufficiency of the Evidence*

In his second issue, Appellant contends that, under an application of the accomplice witness rule, the evidence was insufficient to support his conviction. Specifically, Appellant asserts that no witnesses other than Hight and Mathis said that Appellant was present during the planning of the crime or when the crime was committed, no forensic or DNA evidence linking Appellant to the crime was found, and that Day testified that Appellant was not the person she saw running from the scene with a firearm in his hand. The State asserts that Hight and Mathis were not accomplice witnesses whose testimony required corroboration, but there was nevertheless sufficient evidence to corroborate their testimony.

In order to support a conviction based on the testimony of an accomplice, there must be corroborating evidence that tends to connect the accused with the offense. CRIM. PROC. art. 38.14; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). In reviewing the sufficiency of corroborating evidence, we eliminate the accomplice testimony from consideration and focus on the remaining portions of the record to determine whether there is any evidence that tends to connect the defendant with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999)). The corroborating evidence may be direct or circumstantial and need not be

sufficient by itself to establish the defendant's guilt; it is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). Such corroboration may come from small details. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). We review the corroborating evidence in the light most favorable to the verdict. *Taylor v. State*, 328 S.W.3d 574, 578 (Tex. App.—Eastland 2010, pet. ref'd). Once corroborated, testimony of an accomplice may be considered by the jury in the same manner as other competent evidence. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

In our disposition of Appellant's first issue, we determined that neither Mathis nor Hight were Appellant's accomplices. As such, the accomplice witness rule has no application to a review of the sufficiency of the evidence in this case.

We further note that Mathis's version of events came from his recorded statement to interviewing police officers—not his in-court testimony at Appellant's trial. Mathis's out-of-court statement that was admitted at trial was significant because he stated to the police that Appellant shot Boyles. This fact that Mathis's out-of-court statement was admitted at trial has an important effect on our analysis:

> Only an accomplice's in-court testimony need be corroborated. *Bingham v. State*, 913 S.W.2d 208, 211–213 (Tex. Crim. App. 1995). Although an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person, *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011), an accomplice's out-of-court statement does not, itself, have to be corroborated under [Article] 38.14, and the jury is entitled to regard it as independent evidence of an appellant's guilt as long as it is corroborated as required by Texas Rule of Evidence 803(24) (statement against interest). *Archie v. State*, 340 S.W.3d 734, 737 n.3 (Tex. Crim. App. 2011).

*Bible v. State*, 524 S.W.3d 257, 260–61 (Tex. App.—Waco 2016, no pet.); *see also Ruiz v. State*, 631 S.W.3d 841, 854 (Tex. App.—Eastland 2021, pet. ref'd)

16

("Article 38.14 only addresses and applies to 'accomplice-witness' *testimony*, and not *statements*, any past statements that were made by [the witness] and that were elicited through the testimony of those to whom the statements were made do not fall within the purview of Article 38.14."); *Qualls v. State*, 547 S.W.3d 663, 671 (Tex. App.—Fort Worth 2018, pet. ref'd) ("[A]n accomplice's out-of-court statement may not be used as corroboration . . . but it is also not evidence requiring corroboration under Article 38.14."). Mathis's statement, which was given during an interview conducted during the investigation of Boyles's death, was not in-court testimony. Therefore, it was not accomplice witness testimony subject to the corroboration requirement of Article 38.14. *See Bible*, 524 S.W.3d at 260–61. Further, because Appellant's trial counsel did not object to the State's admitted portions of Mathis's interview, "any error in admitting the statement was not preserved and the statement was admitted for all purposes." *See id.* at 261 (noting that the lack of an objection at trial prevents a later complaint that an out-of-court statement is not corroborated under Rule 803(24) of the Texas Rules of Evidence). Thus, even if Mathis was an accomplice, his out-of-court statement was not subject to the corroboration requirement of Article 38.14. *See id*.

Further, even if we assume that (1) the trial court erred in refusing to include an accomplice witness instruction in its charge, and (2) Hight's testimony constituted accomplice witness testimony, there was still sufficient non-accomplice evidence to corroborate Hight's testimony. Ortiz testified that Hight-Ealy told her Appellant had shot someone. Ortiz also heard Appellant tell Hight-Ealy to "calm down" because Hight-Ealy "didn't shoot [Boyles]." Finally, Ortiz testified that she had never seen Hight-Ealy, Hight, or Mathis with a firearm, but she knew Appellant "always" had a firearm on his person. Because there was sufficient evidence to corroborate Hight's testimony, the jury would have been free to consider it in the same manner

17

as other competent evidence—even if it was accomplice witness testimony. *See Herron*, 86 S.W.3d at 632. We overrule Appellant's second issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


February 21, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.